Filed 8/26/24  Healthcare Management v. R.O.A.R. Management CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| HEALTHCARE MANAGEMENT ASSOCIATES, INC., et al., <br><br> Plaintiffs, Cross-defendants, and Appellants, <br><br> v. <br><br> R.O.A.R. MANAGEMENT COMPANY, INC., et al., <br><br> Defendants, Cross-complainants, and Respondents. | B330809 <br><br> (Los Angeles County Super. Ct. No. 22STV10768) |

APPEALS from an order of the Superior Court of Los Angeles County, Daniel M. Crowley, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Law Offices of Olaf J. Muller and Olaf J. Muller for Plaintiffs, Cross-defendants, and Appellants Healthcare Management Associates, Inc., Mary Aviles, National Intra-Operative Monitoring, Inc., and Orangewood Surgical Center, LLC.

Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, Benjamin N. Gluck, and Elliot C. Harvey Schatmeier for Cross-defendants and Appellants Ismael Silva, Jr., M.D., Ismael Geli Silva, James Aviles, Starbase, Inc., and American Financial Investment Services, Inc.

Steptoe, Ashwin J. Ram, Alexander Avery, Destinae Demery, and Nicolena Farias-Eisner for Defendants, Cross-complainants, and Respondents Ari Resnik and R.O.A.R Management Company, Inc., and for Defendant 11 Funding LLC.

————————————————

Healthcare Financial Solutions, LLC (HFS) was a company that factored healthcare-related receivables. When the parties that formed it, Ari Resnick through R.O.A.R. Management Company, Inc. (ROAR) and Dr. Ismael Silva, Jr. through Healthcare Management Associates, Inc. (HMA), could not agree how to dissolve it, litigation commenced. HMA sued Resnick, ROAR, and another Resnick-owned company for breach of the HFS operating agreement, theft of trade secrets, and various business-related torts. Resnick and ROAR (the Resnick parties) filed a cross-complaint against HMA and another individual for declaratory relief and breach of fiduciary duty. The Resnick parties assert that during the litigation they learned that a decade's worth of Silva's past assurances, including his statements about the lack of merit to numerous prior civil suits and a criminal case against Silva, were untrue. The Resnick parties then filed a first amended cross-complaint (FAXC), asserting Racketeer Influenced and Corrupt Organizations Act (RICO; 18 U.S.C. § 1961 et seq.) claims and a civil fraud cause of

action against Silva and others allegedly affiliated with him based on Silva's alleged misrepresentations.

Silva and the cross-defendants named in these RICO and fraud claims either filed or joined in an anti-SLAPP[1] motion to strike portions of the FAXC. Silva and his fellow cross-defendants argued certain allegations of the FAXC described statements made in connection with prior litigation and, thus, were protected activity. They further argued the Resnick parties had not demonstrated that these claims had minimal merit.

The trial court denied the special motion to strike. It found the challenged allegations were not protected activity because they related to statements about judicial proceedings and not to statements made in connection with judicial proceedings. As its analysis of the first prong of section 425.16 was dispositive, the court did not address whether the Resnick parties' claims had minimal merit.

Silva and his fellow cross-defendants argue the trial court erred because statements made about legal proceedings to interested nonparties are protected conduct under the anti-SLAPP statute, and the Resnick parties failed to show those allegations have minimal merit. The Resnick parties counter that the trial court properly denied the special motion to strike because the challenged portions of the FAXC are only context or

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) For clarity, we also refer to a "SLAPP" or "anti-SLAPP" motion as "a special motion to strike"—the language used in the statute (Code Civ. Proc., § 425.16, subd. (b)(1)). All unspecified statutory references are to the Code of Civil Procedure.

evidence of the wrongs complained of, and do not supply the elements of any cause of action. To the extent any of the subject allegations involve protected activity, the Resnick parties have abandoned any effort on appeal to contend such claims have minimal merit. Instead, the Resnick parties argue the appropriate disposition would be to strike only those claims involving protected activity and not their causes of action, which they contend they can state without any stricken allegations.

The allegations challenged by the special motion to strike fall into four categories: (1) statements Silva or other cross-defendants made *about* other lawsuits to interested parties; (2) statements Silva made *in* other lawsuits (most of which he made in an unrelated family law divorce case); (3) information the Resnick parties learned from the other lawsuits; and (4) allegations that appear to have nothing to do with any prior lawsuit. As to the first category, case law establishes that statements by a litigant about a lawsuit to an interested person are protected conduct and, here, those protected statements supply at least one element of the RICO and fraud causes of action alleged in the FAXC. However, as to the remaining categories, none of the allegations concerning litigation-related statements supply an element of the challenged claims. Accordingly, we reverse in part, and remand with instructions to strike only the statements in the first category. We affirm the denial of the special motion to strike as to the remaining allegations.

4

# BACKGROUND

## A.    Events Giving Rise to the FAXC

### 1.    *Factual Overview*

As the parties' dispute on appeal involves only the first step of the anti-SLAPP analysis, we begin with the pertinent allegations of the FAXC.  In 2010, Resnick and Silva discussed forming a factoring business to purchase medical accounts receivable from healthcare treatment providers at a discount and then collect on them.  They agreed to each invest $500,000 into the new company.  Resnick would further contribute his expertise in lien factoring, networking, and accounting; Silva would use his expertise and connections to obtain additional financing.  Thus, HMA and ROAR formed HFS.  Resnick owned ROAR, and although HMA was nominally owned and operated by Silva's sister and cross-defendant, Mary[2] Aviles, Silva actually operated and controlled HMA.  HFS was a manager-controlled LLC, and Resnick was its sole manager.

In 2021, Resnick sought to dissolve HFS pursuant to the terms of its operating agreement.  HFS informed clients that they could send their business to ProCare Funding, LLC (ProCare), a company run by Mary Aviles's son, James Aviles, and her former son-in-law, Ernest Medina, or to 11 Funding, LLC (11 Funding), a company headed by ROAR and Resnick.

The parties could not agree upon dissolution terms and filed lawsuits against one another in early 2022.  Nearly a year later, in February 2023, the Resnick parties filed their FAXC.

---

[2] Mary Aviles is sometimes referred to in the record as Mari.  We use Mary throughout the opinion for consistency.

The FAXC alleged that as a result of the litigation, the Resnick parties more closely scrutinized Silva's representations and actions since 2010, " 'connect[ed] the dots,' " and determined cross-defendants had defrauded them.

2.     *The Parties*

According to the FAXC, Silva is an orthopedic surgery specialist who owns or controls several entities even if he is not formally named as an officer, owner, or manager, including cross-defendants HMA, National Intra-Operative Monitoring, Inc. (NIOM), Orangewood Surgical Center, LLC (Orangewood), Starbase, Inc. (Starbase), and American Financial Investment Services, Inc. (AFIS), and non-parties Healthpointe Medical Group, Inc. (Healthpointe) and ProCare.  Other than NIOM and Healthpointe, these companies are headed, on paper, by Silva's relatives, including cross-defendants Mary Aviles for HMA, James Aviles for Orangewood and ProCare, and Silva's son, Geli Silva (Geli) for AFIS and Starbase, and non-party Medina for ProCare.

Until sometime in 2014, Mary Aviles appeared to serve as the chief executive officer of Healthpointe, a group of medical clinics.  Until approximately 2016, HFS purchased liens or accounts receivable from non-Healthpointe facilities where Healthpointe physicians performed surgery on Healthpointe patients.  Concerned about the connection between HMA and Healthpointe, Resnick asked Silva whether Mary Aviles owned or controlled Healthpointe.  Silva assured him that Mary Aviles was not an owner or officer of Healthpointe and that Silva's attorney had advised the business arrangement between HMA and Healthpointe was legal.  The FAXC suggests that sometime in

6

2014, Silva became the chief executive officer, secretary, chief financial officer, president, and a director of Healthpointe.

Orangewood is a surgery center from which HFS directly purchased liens for procedures performed by Healthpointe physicians for Healthpointe patients.

NIOM provides real-time information about patients' neurophysiologic status throughout surgery. In 2010, Silva was president and secretary of NIOM; by 2021, Mary Aviles appeared in corporate filings as the authorized agent for NIOM. Silva caused Healthpointe physicians to use NIOM monitoring services for their patients without disclosing any conflict of interest.

As described below, Starbase and AFIS provided financing to HFS.

### 3. *Financing for HFS*

In or about 2011, Silva advised the Resnick parties that HFS's only available financing option was a medical device company, Starbase, owned by Geli. HFS entered into a credit facility with Starbase, secured by a lien on accounts receivable proceeds. In 2012, Silva obtained financing from Citibank purportedly for Healthpointe. The Resnik parties allege that Silva used the loan proceeds from Citibank to fund Starbase and, in turn, finance the loans to HFS at higher interest rates.

In April 2015, Starbase assigned its security interest in HFS's assets and accounts receivables to American Global Financial, Inc., whose authorized agent was James Aviles. In 2015, American Global Financial, Inc. was renamed AFIS. Silva and Geli represented to Resnick that Silva had nothing to do with AFIS's business.

7

4. *Silva, His Companies, and His Family Members Are Named in Lawsuits and a Criminal Prosecution*

In 2011, a physician at Healthpointe sued it and Silva in Orange County Superior Court, asserting claims that included fraud and breach of contract. Among other things, the physician alleged that Silva overbilled insurance companies for physician services at Healthpointe, pressured physicians to perform unnecessary medical procedures, and concealed conflicts of interest from Healthpointe patients. The FAXC does not state when the Resnick parties learned of this lawsuit or that Silva made any representations to Resnick about this lawsuit.

On October 16, 2013, WorkCompCentral, a workers' compensation industry publication, reported that Healthpointe was involved in a qui tam case asserting it had overbilled for procedures and devices, used counterfeit medical implant hardware, and paid illegal kickbacks to doctors. The publication further asserted Silva controlled Healthpointe. In response to this article, Silva reassured Resnick there was no problem with HFS continuing to accept business generated by Healthpointe. However, HFS scaled back its purchase of liens from Healthpointe. Silva and Mary Aviles formed ProCare, which accepted lien referrals from Healthpointe.

In May 2015, Resnick discovered that Silva, Starbase, and Healthpointe had been named in a civil RICO lawsuit filed by the State Compensation Insurance Fund (SCIF). When Resnick emailed Silva about the lawsuit, Silva assured Resnick that the allegations were not true, but that they might have to deal with bad publicity.

In 2017, the Orange County District Attorney filed a felony complaint against Silva and Geli for fraud and kickbacks related

to patient and client referrals. The complaint asserted that Healthpointe doctors referred workers' compensation applicants for urine toxicology tests administered by Christopher King and Tanya Moreland King, and Silva aided the Kings in submitting fraudulent claims for payment. In exchange, the Kings made payments to Starbase. Resnick learned about the lawsuit, but Silva assured Resnick that Starbase and AFIS would cooperate to protect HFS and that Geli, but not Starbase, had been named as a criminal defendant.

In 2021, Silva's then-spouse filed for divorce. During those family law proceedings, in 2022, Silva misrepresented to his spouse and the family court that he had no ownership interest in Orangewood, ProCare, NIOM, Starbase, HFS, or other companies.

5. *The Resnick Parties Seek to Dissolve HFS*

In 2022, HFS was due to repay to AFIS loans totaling approximately $13 million in principal. Up until that time, HFS had made only interest payments on the loans of approximately $5.1 million with no reduction in principal. Resnick realized HFS was heading for a cash flow crisis and met with Silva to discuss paying off the loans. Silva rejected Resnick's proposal, and Mary Aviles agreed with Silva's decision. Resnick "realized he had been defrauded by Silva—who represented to him, as far back as 2010, that there were no other financing options available—and by Geli, Starbase, and AFIS—who concealed that Silva effectively owned, controlled, and profited from Starbase and AFIS." Although "Silva had promised to contribute to HFS'[s] business by using his expertise and connections to obtain additional financing, it appear[ed] that he never even shopped around." Further, Resnick believed Silva was not holding up his end of the

9

bargain in other ways, forcing Resnick to do a disproportionate share of the work operating HFS.

Believing HFS could no longer continue doing business and because Resnick no longer trusted Silva, the Resnick parties proposed dissolving HFS. However, Resnick and Silva could not agree to terms, and Resnick eventually gave notice under HFS's operating agreement to dissolve the company. HFS informed its employees and clients of the dissolution and indicated Silva and Resnick would carry on in the factoring business separately, as ProCare and 11 Funding.

6. *The Litigation*

On March 29, 2022, HMA sued Resnick, ROAR, and 11 Funding for, inter alia, breach of fiduciary duty, breach of the operating agreement, fraud, conversion, misappropriation of trade secrets, and intentional interference with prospective economic relations.

On May 16, 2022, Resnick and ROAR, individually and derivatively on behalf of HFS, cross-complained against HMA and Mary Aviles for declaratory relief and breach of fiduciary duty. The court sustained a demurrer by HMA and Mary Aviles as to the declaratory relief claims and concluded that only ROAR, derivatively, could pursue the causes of action for breach of fiduciary duty.

On February 10, 2023, the trial court granted the Resnick parties' motion for leave to file the FAXC. The FAXC included new causes of action for violation of RICO and conspiracy to violate RICO (first and second causes of action) and fraud (third

10

cause of action).[3]  It attached 15 exhibits, including checks, emails, HFS status updates, articles, the 2017 felony complaint, corporate formation documents, and accounting documents.

As part of their RICO and fraud claims, the Resnick parties alleged cross-defendants committed fraudulent acts, including (a) misrepresenting that Silva did not control or own HMA, Starbase, AFIS, NIOM, and Orangewood; (b) misrepresenting that Mary Aviles was not an actual owner or operator of Healthpointe, NIOM, and Orangewood; (c) misrepresenting that Silva would search for and procure arms-length financing for HFS, when he only ever planned to propose financing from Starbase/AFIS; (d) deriving increased profits from the tainted Starbase/AFIS loan to HFS; (e) concealing ill-gotten gains and disguising their source, location, and ownership by transferring such monies between Starbase/AFIS and HFS, and NIOM and Healthpointe; (f) deriving profits from kickbacks paid on patient services ancillary to surgery without disclosing the conflict of interest of dual ownership and control over Healthpointe, Orangewood, and NIOM to patients, health care benefit programs, and workers' compensation carriers; and (g) misrepresenting to Citibank that the purpose of Silva's asset-based loan was for Healthpointe's business.  The Resnick parties further alleged Silva or "[c]ross-[d]efendants" misrepresented facts relating to the civil and criminal lawsuits.

---

[3] The FAXC also alleged that Mary Aviles and HMA breached their fiduciary duty to HFS (fourth and fifth causes of action).  However, none of the challenged allegations concern these claims and, thus, we need not address them.

The Resnick parties alleged they were economically injured by (1) cross-defendants' use of Starbase/AFIS financing to HFS to launder illegally or fraudulently obtained monies; (2) Starbase/AFIS's fraudulent lending, under which HFS paid $5.1 million in interest, and which caused a cash flow crisis that damaged ROAR and thereby ROAR's ownership interest in HFS; (3) any potential criminal investigation and penalties that they suffered or will suffer as a result of being unwitting participants in cross-defendants' criminal enterprise; (4) "reputational harm," including lost goodwill; (5) lost profits including those arising from an inability to collect current accounts receivable owed to HFS; and (6) lost business opportunities.

For each of the three causes of action, the Resnick parties alleged that they relied on cross-defendants' representations as follows (or in some similar variation): "Had Silva not misrepresented facts regarding civil complaints against him and his entities, the criminal complaint against Silva and Geli, and Silva's effective control of numerous conflicted business entities, [cross-complainants] would never have initially agreed to form HFS with HMA and [Mary] Aviles, or do business with Orangewood, Starbase, AFIS, or other Silva/Aviles Family RICO Enterprise [e]ntities[, which include Healthpointe and NIOM]. Had [c]ross-[d]efendants not continuously misrepresented the nature of civil lawsuits being brought against Silva and Starbase and Healthpointe, or of criminal lawsuits brought against Silva and Geli, [c]ross-[c]omplainants would have dissolved the HFS partnership much earlier."

## B. The Special Motion to Strike

### 1. *The Parties' Arguments*

On April 13, 2023, HMA, Mary Aviles, NIOM, and Orangewood (together, HMA defendants) filed a special motion to strike certain allegations related to the RICO and fraud claims from the FAXC. To avoid repetition, we describe these challenged portions in the Discussion, *post*.

The HMA defendants argued that the FAXC sought "to hold [c]ross-[d]efendants liable for litigation-related communications and actions." For example, the FAXC alleged that Silva lied to Resnick about pending lawsuits and that the Resnick parties relied on such representations to their detriment because they did not dissolve HFS sooner and instead entered into business transactions with various Silva-controlled entities. The HMA defendants argued the anti-SLAPP statute protected such speech as statements made in connection with an issue under consideration or review by a judicial body and as other conduct in furtherance of the exercise of the constitutional right of petition. (§ 425.16, subd. (e)(2), (4).) They further argued that the Resnick parties could not demonstrate their claims had minimal merit.

In support of their motion, the HMA defendants sought judicial notice of the following court documents: (1) the dismissal of the 2011 civil matter filed by the Healthpointe physician; (2) court orders dismissing with prejudice Silva, Starbase, and Healthpointe from the civil RICO action filed by SCIF based upon a stipulation of the parties; and (3) minutes of the Orange County Superior Court in January 2023 dismissing the 2017 felony complaint against Silva and others. They also submitted Silva's declaration.

13

On May 9, 2023, Silva, Geli, James Aviles, Starbase, and AFIS (together, the Silva defendants) joined in the HMA defendants' special motion to strike.

In opposition, the Resnick parties argued the challenged allegations did not "arise from" protected activity and were not asserted as grounds for relief. Rather, the allegations at issue merely provided context or served as evidence of the wrongs described. The Resnick parties further argued that all parties other than Silva lacked standing to bring the anti-SLAPP motion because the challenged allegations concerned only Silva's speech. The Resnik parties argued their action had minimal merit under the second prong. Resnick submitted a six-page declaration in support of the opposition, to which the HMA defendants objected in part.

2.    *The Trial Court's Ruling*

The trial court denied the special motion to strike. It found the claims at issue "are not based on statements made in connection with those [legal] proceedings (i.e., made in the context of the proceeding); the statements [c]ross-[c]omplainants sue upon are [m]oving [p]arties' representations to [c]ross-complainants about those proceedings." It further found "the acts underlying [the] causes of action in the [FAXC] are not based upon [c]ross-[d]efendants' exercise of their furtherance of [*sic*] their constitutional right to petition or free speech in their defense of the Orange County District Attorney's action. The statements sued upon were not made to further [c]ross-[d]efendants' positions in [such cases]. Instead, [c]ross-[c]omplainants alleged that [c]ross-[d]efendants made misrepresentations about the litigation in order to assuage [c]ross-[c]omplainants to continue to do business with [c]ross-

14

[c]omplainants.  The statements were not made in furtherance of the [c]ross-[d]efendants' right of petition or free speech, but, rather, to induce [c]ross-[c]omplainants to remain in business with them."  However, the trial court also found the "FAXC is based on [c]ross-[d]efendants' allegedly wrongful lawsuit-related communications, which serve as the basis for the fraud, breach of fiduciary duty, civil RICO violations, and conspiracy to commit civil RICO violations."

Because it found that the cross-defendants failed to meet the first prong of the anti-SLAPP analysis, the trial court did not consider whether the claims had minimal merit under the second prong.  The trial court granted the HMA defendants' request for judicial notice and denied all evidentiary objections to Resnick's declaration.

## DISCUSSION

### A.    General Legal Principles and Standard of Review

The Legislature enacted section 425.16 "[t]o combat lawsuits designed to chill the exercise of free speech and petition rights." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)  To that end, the anti-SLAPP statute provides that "cause[s] of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

When considering whether to strike a claim, courts undertake a two-prong analysis.  "First, the defendant must

15

establish that the challenged claim arises from activity protected by section 425.16.  [Citation.]"  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384; accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)  "When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage."  (*Baral v. Schnitt*, *supra*, at p. 396.)

"If the defendant makes the required [first-prong] showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."  (*Baral v. Schnitt*, *supra*, 1 Cal.5th at p. 384.)  A "plaintiff's second-step burden is a limited one.  The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation].  At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' [Citations.]"  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.)

We review de novo the trial court's grant or denial of a special motion to strike under the anti-SLAPP statute.  (*Park*, *supra*, 2 Cal.5th at p. 1067.)

**B.    Prong One:  Some of the Challenged Allegations Arise from Protected Activity**

Section 425.16, subdivision (e)(2) defines protected conduct to include statements made in connection with an issue under

16

consideration by a judicial body.[4]  Section 425.16, subdivision (a) provides the anti-SLAPP statute "shall be construed broadly," and in keeping with that mandate, "courts have adopted 'a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16.' " (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537.)

Cross-defendants argue the challenged allegations concern statements made in connection with issues under consideration by a judicial body and that they form one or more of the necessary elements of the RICO and fraud claims.  The Resnick parties, on the other hand, argue their claims do not "arise from" the litigation-related statements.  Rather, each of the challenged allegations is merely context for or evidence of cross-defendants' fraud perpetrated against the Resnick parties.  They further argue that all cross-defendants other than Silva lack standing to bring an anti-SLAPP motion.

As we observed above, the challenged allegations fall into four categories: (1) statements Silva or other cross-defendants made *about* other lawsuits; (2) statements Silva made *in* other lawsuits; (3) information the Resnick parties learned from the other lawsuits; and (4) allegations that appear to have nothing to do with any prior lawsuit.  We address these categories after first disposing of the Resnick parties' standing argument.

---

[4] The HMA defendants' appellate briefing makes a one-time reference to section 425.16, subdivision (e)(4), which protects "other conduct in furtherance of the exercise of the constitutional right of petition," but neither party sets forth any argument on appeal relying on that provision.

1. *Standing*

On appeal, the Silva defendants seek to strike a narrower universe of allegations than the HMA defendants.[5] The Resnick parties argue that all non-Silva cross-defendants lack standing to move to strike any claims not challenged by Silva. The Resnick parties claim the FAXC alleges that Silva alone, and no one else, made the claimed statements and therefore only his potentially protected conduct is at issue. Although the FAXC is not a model of clarity, its allegations attribute the statements of Silva to all cross-defendants as though those cross-defendants also made them. Among other things, the FAXC alleges that "each of the cross-defendants was the co-conspirator of each and every other cross-defendant and, in performing the acts herein alleged, was acting within the scope of such conspiracy," such that any statements Silva made are equally chargeable to the cross-defendants. The Resnick parties further allege that "cross-defendants," meaning every single one of them, "continuously misrepresented the nature of [the] civil lawsuits being brought against Silva and . . . , or of criminal lawsuits brought against Silva and Geli."

The Resnick parties cannot claim non-Silva parties lack standing to challenge the statements at issue, while at the same time asserting each statement by Silva is attributable to all cross-defendants as though the cross-defendants themselves spoke because all cross-defendants were Silva's co-conspirators. In any event, the FAXC further alleges the non-Silva cross-

_____

[5] The Silva defendants' reply brief "narrow[ed] the scope of their appeal" to paragraphs 45, 46, 51, 67(c), 118, 119, 120, 126, 127, 128, and 138 or portions thereof.

18

defendants themselves "continuously misrepresented the nature of [the] civil lawsuits" and the "criminal lawsuits." We therefore reject the Resnick parties' standing argument. Each of the cross-defendants has standing to challenge the trial court's denial of the anti-SLAPP motion.

2. *Category 1: Statements Made About Other Lawsuits*

a. The Challenged Allegations

The first category of challenged allegations concern statements made about pending lawsuits. The identified allegations are as follows.

Paragraph 7 at page 6, lines 11 to 13: "Following this [f]elony [c]omplaint filing, as detailed below, Silva assuaged and 'lulled' ROAR and Resnik to avoid detection of the fraud being perpetrated under their noses." (Fn. omitted.)

Paragraph 42 at page 14, lines 21 to 22, describing Silva's response to Resnick concerning the October 16, 2013 WorkCompCentral article about the qui tam action: "Silva reassured Resnik that there was no problem with continuing to accept business generated from Healthpointe physicians and patients."

Paragraph 45: "In response [to Resnick's email about the 2015 civil RICO lawsuit], Silva emailed Resnik several voice messages reassuring Resnik that the allegations were not true. [Image.] The attached voice message from Silva reads: [¶] 'So yeah I just looked at the WorkCompCentral article . . . um as I mentioned I had already seen this . . . lookin' at it, there wasn't anything specific that says that the amount of money that they have to prove up . . . because there wasn't any of that happening . . . obviously there's a lot of allegations all against me and they're not true. . . .' "

Paragraph 46 at page 15: "Silva emailed another voice message to Resnik later that morning representing that the only problem posed by the civil RICO lawsuit was that it would create bad publicity. [Image.] The attached voice message from Silva reads: [¶] 'this thing will get long and drawn out and expensive and um the thing is though, take a look at the comment at the right of the patient, probably made by an ortho surgeon or a doctor or a plant by the newspaper itself . . . yeah we're going to be okay in all this, no question about it, it's just the publicity behind it that's the problem . . . we've got all this BS going on . . . in the long run there is no question in my mind we'll be fine . . . you're innocent until proven guilty . . . they're going to have a hard pressed time with a number of the guys here . . . none of these issues . . . I'm not concerned . . . the problem is that we're going to have to defend all this.' "

Paragraph 47 at page 17: "Because dozens of physicians and health care adjacent entities were discussed in the [SCIF RICO] lawsuit, Resnik accepted Silva's representations at the time, believing that a plaintiff's attorney might have been aggressive in naming defendants."

Paragraph 51 at page 17, line 21 to page 18, line 8: "Silva responded to the news [concerning the 2017 criminal complaint] by marking up a contemporaneous status update with a stylus and tablet, informing Resnik that there was no concern because Starbase and AFIS would cooperate to protect HFS, neither was a named defendant, and Silva's name was not associated with Starbase, rather Geli's name was the one on paper: [image of marked up status report]."

Paragraph 63 at page 21, lines 4 to 11: "After all, the lawsuits against Healthpointe and Starbase had been civil in

20

nature, and Silva repeatedly provided reassurances to Resnik that superficially appeared to prove true. For example, when Silva reassured Resnik that there was no cause for concern about the 2012 [q]ui [t]am lawsuit, the lawsuit resolved without any harm to HFS. And when Silva reassured Resnik that there was no cause for concern about the 2015 civil RICO lawsuit, the lawsuit was dismissed without any harm to HFS. So, when the 2017 [f]elony [c]omplaint was filed by the Orange County District Attorney's office, and Silva said it would only implicate Geli and that there was no cause for concern, ROAR and Resnik continued to believe Silva."

Paragraph 67(c) at page 23, lines 15 to 17: "At the time, Silva reassured Resnik that many defendants had been wrapped up in the SCIF case, and it would simply be a publicity problem."

Paragraph 118 at page 48, line 27 to page 49, line 2; and paragraph 126 at page 52, lines 9 to 10: "Cross-[d]efendants' misrepresentations to [c]ross-[c]omplainants of facts relating to civil lawsuits against Silva, Healthpointe, and Starbase . . . ."

Paragraph 118 at page 49, lines 5 to 6; paragraph 126 at page 52, lines 14 to 15; paragraph 128 at page 53, lines 15 to 16; and paragraph 138 at page 56, lines 16 to 17: "[C]ivil complaints against him and his entities, the criminal complaint against Silva and Geli."

Paragraph 118 at page 49, lines 9 to 12; paragraph 119 at page 49, lines 22 to 25; paragraph 120 at page 50, lines 10 to 13; paragraph 126 at page 52, lines 18 to 21; paragraph 128 at page 53, lines 19 to 22; paragraph 138[6] at page 56, lines 20 to 23;

---

[6] In their motion, the HMA defendants stated that they sought to strike paragraph 134. Based upon their page and line

21

and paragraph 139 at page 57, lines 5 to 8: "Had Cross-[d]efendants not continuously misrepresented the nature of civil lawsuits being brought against Silva and Starbase and Healthpointe, or of criminal lawsuits brought against Silva and Geli, ROAR and Resnik would have dissolved the HFS partnership much earlier."

Paragraph 120 at page 50, lines 6 to 7: "[C]ivil complaints against him and various [c]ross-[d]efendant [e]ntities, the criminal complaint against Silva and Geli."

Paragraph 127 at page 53, lines 4 to 7: "Had Silva not continuously misrepresented the nature of civil lawsuits being brought against Silva and Starbase and Healthpointe, or of criminal lawsuits brought against Silva and Geli, [c]ross-[c]omplainants would have dissolved the HFS partnership much earlier."

Paragraph 138 at page 56, lines 9 to 11: "Cross-[c]omplainants are entitled to recover damages arising from reputational harm that [c]ross-[c]omplainants suffered as a direct and proximate cause of [c]ross-[d]efendants' misrepresentations to [c]ross-[c]omplainants of facts relating to his criminal indictment."

b. Analysis

Cross-defendants liken the above statements to those in *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255 and *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, among other cases. Those cases held movants had satisfied the first prong of the anti-SLAPP analysis because

references as well as the content of the paragraphs, it is clear they intended to strike paragraph 138.

the challenged statements were about substantive issues in the litigation and directed to interested nonparties, and, thus, " 'in connection with' litigation under section 425.16, subdivision (e)(2)." (*Neville v. Chudacoff*, *supra*, at p. 1266; *Contemporary Services Corp. v. Staff Pro Inc.*, *supra*, at p. 1055.)

For example, in *Neville v. Chudacoff*, *supra*, 160 Cal.App.4th at page 1259, the defendant employer fired one of its employees for soliciting customers to start a competing business. Months prior to any litigation, employer's counsel wrote a letter to the customers that accused the employee of breach of contract and misappropriation of trade secrets and suggested that, to avoid potential involvement in any ensuing litigation " 'as a material witness, or otherwise,' " the customers should not do business with the former employee. (*Ibid*.) The employer sued the employee for misappropriation of customer lists and related misconduct; the employee cross-complained for defamation. (*Id*. at pp. 1259, 1260.) The employer filed an anti-SLAPP motion to the employee's cross-complaint. (*Id*. at p. 1260.) In opposition, the employee argued the anti-SLAPP statute did not apply because, among other things, the letter was sent to nonparties. (*Id*. at p. 1262.) The appellate court disagreed and concluded the letter was protected conduct because it related directly to the employer's claims and was sent to "persons whom [the employer] reasonably could believe had an interest in the dispute." (*Id*. at pp. 1267-1268.)

In *Contemporary Services Corp. v. Staff Pro Inc., supra,* 152 Cal.App.4th 1043, a plaintiff sued for unfair competition. (*Id*. at p. 1048.) During the litigation, the trial court sanctioned the plaintiff for discovery abuses. (*Id*. at pp. 1048-1049.) The defendants thereafter emailed customers to " 'update' " them on

" 'the court[']s findings.' " (*Id*. at pp. 1050.) Defendants claimed the email was sent " 'to give these persons some level of comfort that it was unlikely any further testimony would be needed from them' " and " 'to apologize for any disruption to their business that occurred as a result of being "dragged into" the . . . [a]ction because of their connection to [the defendants].' " (*Id*. at p. 1050.) The plaintiffs sued the defendants for sending this email, and the defendants filed an anti-SLAPP motion. (*Id*. at p. 1051.) The appellate court concluded that the anti-SLAPP statute protected the email because it "constitute[d] a litigation update, which describes the parties' contentions and court rulings, and is directed to individuals who had some involvement in the parties' litigation." (*Id*. at p. 1055.)

The Resnick parties do not dispute that statements about a pending litigation made to interested nonparties like themselves fall within the ambit of the anti-SLAPP statute, so we need not discuss the merits of cross-defendants' contention on that point. Nor do the Resnick parties dispute that they were interested in the 2013 qui tam action, the 2015 SCIF civil RICO action, and the 2017 criminal action filed against one or more of the cross-defendants; indeed, the Resnick parties expressly allege that they relied on Silva's explanations about these legal proceedings. Instead, the Resnick parties argue that none of their claims "arise from" the challenged allegations concerning protected activity. Rather, they claim that the information they received from Silva about the lawsuits is merely context for their claims. We disagree.

In determining whether the challenged claims "arise from" protected activity, "courts are to 'consider the elements of the challenged claim and what actions by the defendant supply those

24

elements and consequently form the basis for liability.' [Citation.]" (*Bonni v. St. Joseph Health System*, *supra*, 11 Cal.5th at p. 1009.) " 'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' " (*Id*. at p. 1012, quoting *Baral v. Schnitt*, *supra*, 1 Cal.5th at p. 394.) "[A] claim may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Park*, *supra*, 2 Cal.5th at p. 1060, italics omitted.)

The elements of a civil RICO claim are: " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity . . . (5) causing injury to [the] plaintiff's "business or property." ' [Citation.]" (*Living Designs, Inc. v. E.I. Dupont de Nemours* (9th Cir. 2005) 431 F.3d 353, 361.) " ' "[R]acketeering activity" is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud [and] wire fraud . . . .' [Citation.]" (*Sanford v. MemberWorks, Inc.* (9th Cir. 2010) 625 F.3d 550, 557.) "Mail and wire fraud are identical offenses except for the particular method used to disseminate the fraud. [Citation.] The elements are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to defraud. [Citation.] The 'scheme to defraud' element requires 'an affirmative, material misrepresentation.' [Citation.]" (*In re JUUL Labs, Inc., Marketing, Sales Practices* (N.D.Cal. 2020) 497 F.Supp.3d 552, 595; see also Model Crim. Jury Instr. (9th Cir. 2024) Nos. 15.32, 15.35 [mail and wire fraud under 18 U.S.C §§ 1341, 1343 require "a scheme . . . to defraud . . . by means of false or fraudulent pretenses, representations, or promises . . . , or omitted facts. . . .

25

Deceitful statements of half-truths may constitute false or fraudulent representations"].) The predicate offenses of mail and wire fraud do not require reliance, nor does RICO itself require that the injured party relied on the misrepresentation. (*Bridge v. Phoenix Bond & Indem. Co.* (2008) 553 U.S. 639, 649-650.)

With regard to the state law fraud claim, "The elements of fraud are misrepresentation, knowledge of falsity, intent to induce reliance on the misrepresentation, justifiable reliance on the misrepresentation, and resulting damages." (*Reeder v. Specialized Loan Servicing LLC* (2020) 52 Cal.App.5th 795, 803, citing *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Here, the Resnick parties base their RICO claims on mail and wire fraud. Thus, the Resnick parties' RICO causes of action as well as their fraud cause of action require them to allege misrepresentation. Although the FAXC alleges multiple types of misrepresentations, one is that cross-defendants lied to the Resnick parties about the merits of the civil lawsuits and criminal prosecution. This misrepresentation, which is repeated within the substantive allegations for each of the three causes of action, is an element of the wrong complained of in the Resnick parties' RICO and fraud claims. Further, as to their civil fraud claim, the Resnick parties assert they relied on this misrepresentation about the merits of pending litigation, such that it supplies the element of justifiable reliance. Such allegations, and factual allegations supporting these elements, therefore constitute protected activity subject to a special motion to strike. (See *Park*, *supra*, 2 Cal.5th at p. 1060.)

Accordingly, cross-defendants satisfied their burden to demonstrate that the allegations in this category are protected activity within the meaning of section 425.16, subdivision (e)(2).

### 3. *Category 2: Statements Made in Other Lawsuits or Current Litigation Conduct*

The next category of allegations concerns statements made in other lawsuits. The anti-SLAPP statute recognizes that statements made in judicial proceedings are ordinarily protected activity. (§ 425.16, subd. (e)(1) [statements made "before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" are protected activity].) However, "the critical consideration is whether the cause of action is based on the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, italics omitted.)

All but one of the challenged allegations in this category concern Silva's misrepresentations in 2022 to his former spouse and to the family court during divorce proceedings. In particular, he represented that he did not have any ownership interests in Orangewood, ProCare, NIOM, Starbase, or HFS, among others. However, none of the Resnick parties' claims depend on Silva's misrepresentations in the family court. None of these divorce-related representations was made to the Resnick parties. Nor is there any allegation the Resnick parties were injured by such representations, as they occurred in 2022 *after* they had already decided to part ways with Silva and sought to dissolve HFS in 2021. The FAXC alleges these statements in the divorce proceedings only as evidence for past misrepresentations made before Resnick sought to dissolve HFS. Thus, the trial court properly denied cross-defendants' motion to strike the following.

Entirety of paragraph 103 at page 45: "In February 2021, Silva's ex-wife, Ksenia Silva, filed a [m]arriage [d]issolution and [d]ivorce lawsuit against Silva, and on April 12, 2022, Silva and Ksenia entered into a [s]tipulated [j]udgment of [d]issolution. In

27

his proceedings, Silva failed to truthfully disclose the entities in which he has an interest, either directly or through his family members, including HMA. Rather, he acknowledged the entities in which he claims he never had any ownership interest. And he does not disclose any interest in HFS, which he refers to as 'Factoring Company' (rather than by name)."

Entirety of paragraph 104 at page 45: "The following is an excerpt from Silva's divorce settlement, which includes self[-]serving and fraudulent provisions mischaracterized as court findings that, on information and belief, are designed to hide his assets from his former spouse and insulate Silva from later being found to have unrecorded ownership interests and actual control of the Silva/Aviles RICO Enterprise [e]ntities: [Image of stipulation that Silva never had any ownership interests in Orangewood, ProCare, NIOM, Starbase, Factoring Company, and two other third party companies]."

Entirety of paragraph 105 at page 45: "Silva concealed his assets and revenue from his former spouse and from the [f]amily [c]ourt, to which he was legally obligated to disclose such information under penalty of perjury."

Entirety of paragraph 106 at page 46: "Silva engaged in this fraudulent disclosure to the [f]amily [c]ourt and his former spouse to conceal the existence and role of the Silva/Aviles Family RICO Enterprise with respect to HFS and the other entities listed in the fraudulent filing. As such, the filing is evidence of the entities forming part of the Silva/Aviles Family RICO Enterprise, and further perpetuates Silva's fraudulent representations related to his control of and role with HFS (through HMA)."

28

This category contains one additional statement that was not made as part of the family proceedings. The Resnick parties allege at paragraph 66, page 21, line 25 to page 22, line 1 that as to HMA's underlying complaint, "Silva orchestrated this litigation to pressure ROAR into surrendering the HFS business to Silva." This allegation does not form the basis of the Resnick parties' claims, and therefore the trial court properly declined to strike it.

    4.    *Category 3: Information the Resnick Parties Discovered from Lawsuits*

The third category concerns allegations about facts the Resnick parties learned from prior lawsuits. Cross-defendants do not cite any authority for the proposition that statements made in litigation cannot function as a source of information from which a person learns of potential prior wrongs committed against them. Indeed, in such a scenario, the litigation-related statements themselves are not the wrong complained of and, thus, not subject to the anti-SLAPP statute. (See *Park*, *supra*, 2 Cal.5th at p. 1060.) We conclude the trial court correctly found the following challenged allegations in which the Resnick parties describe information they learned from lawsuits did not arise from protected activity.

Paragraph 7 at page 6, lines 10 to 11: "For example, [c]ross-[c]omplainants learned that the Orange County District Attorney filed a [f]elony [c]omplaint against Silva and his son, Geli, for an illegal kickback scheme."

Paragraph 7 at page 6, footnote 1: "The Orange County District Attorney dismissed the charges against Silva and Geli on January 6, 2023. The dismissal was not based on the merits of the case."

29

Paragraph 7 at page 6, lines 13 to 16: "Similarly, [c]ross-[c]omplainants also reviewed the 2021-2022 family court filings of Silva and learned that Silva made false representations about both the ownership/control and value of various entities that he owned, operated, or controlled, including HFS."

Entirety of paragraph 50 at page 17, including footnote 4, which describes the 2017 felony complaint against Silva and his son, Geli.

Paragraph 51 at page 17, lines 19 to 21: "Around the time that the [f]elony [c]omplaint was filed, Resnik learned about it from an article on WorkCompCentral and raised the issue in one of his monthly management updates. A copy of the WorkCompCentral article is attached hereto as Exhibit G." (Bold omitted.)

Paragraph 67 at page 22, line 4 to page 23, line 15: "In recent months, [c]ross-[c]omplainants learned that the criminal conduct harming HFS was only a part of the Silva/Aviles Family RICO Enterprise, and that [c]ross-[d]efendants have been defrauding [c]ross-[c]omplainants and others since at least 2010. Although the following public information helps evidence the scope, structure, and manner/means of the Silva/Aviles Family RICO Enterprise's operations, significant additional discovery from [c]ross-[d]efendants and related entities will be necessary in this regard. [¶] a. In February 2021, Silva's ex-wife, Ksenia Silva ('Ksenia'), filed for dissolution against Silva, and on April 12, 2022, Silva and Ksenia entered into a [s]tipulated [j]udgment of [d]issolution, which listed the various entities in which Silva has an interest. The list omitted HMA, but included far more entities than [c]ross-[c]omplainants previously knew that Silva either owned, operated, or controlled and contained a

30

self-serving, fraudulent recital about Silva's control (or purported lack thereof) of HFS, referring to it only as Factoring Company. [Image of stipulation that Silva never had any ownership interests in Orangewood, ProCare, NIOM, Starbase, 'Factoring Company,' and two other third party companies.] [Citation.] On information and belief, ProCare—the disclosed company—had a small fraction of the business that 'Factoring Company' (HFS) had at the time of the filing. [¶] b. In a 2011 civil lawsuit against Silva for breach of contract and fraud, inter alia, Silva is accused of using alter ego companies to operate health clinics. The plaintiff, a doctor employed by one of those health clinics, made the following allegations against Silva: [image of allegations against Silva]. [Citation.] [¶] c. In 2015, SCIF filed a civil RICO complaint against Starbase and Silva, among dozens of other defendants, accusing them of overbilling, pricing manipulation, and receiving illegal kickbacks and referral fees. [Citation.]"

Paragraph 67 at page 23, lines:17 to 20: "Cross-[d]efendants now have reason to believe that Silva was, in fact, engaging in criminal activity for the reasons identified in this [c]ross-[c]omplaint, and the timing of the switch from Starbase to AFIS was a result of the SCIF litigation and the need to avoid imminent detection of the Silva/Aviles Family RICO Enterprise from law enforcement."

Entirety of paragraph 68 at page 23: "These recent discoveries and others have helped [c]ross-[c]omplainants 'connect the dots' underlying Silva's fraudulent representations and assurances to [c]ross-[c]omplainants, as well as the existence of the Silva/Aviles Family RICO Enterprise and its connection to

31

HFS, HMA, Starbase, and AFIS in ways that directly harmed [c]ross-[c]omplainants."

Paragraph 96 at page 39, lines 2 to 5: "The details of Silva's fraudulent scheme via Starbase/AFIS came to light in recent months from a review of Silva's divorce proceedings, civil lawsuits against Healthpointe, Starbase, and Silva, and the 2017 [f]elony [c]omplaint, all of which contributed to exposing Silva's actual interest in Starbase/AFIS."

  5.  *Category 4:  Allegations Not Connected to Any Lawsuit*

The final category is a catch-all for statements that do not in fact relate to prior litigation.  In making their special motion to strike, cross-defendants characterized the allegations in this category as litigation-related and made no other argument as to why the allegations should be stricken.  However, these allegations have nothing to do with litigation, or alternatively describe cross-defendants' misrepresentations in such general terms that the allegations do not reference litigation-related misrepresentations (particularly given that all of the allegations in category one are no longer part of the FAXC).  Accordingly, we conclude the trial court did not err in finding the following allegations did not implicate protected activity.

Paragraph 63 at page 20, line 26 to page 21, line 4:  "Up until the dissolution process [relating to HFS], ROAR and Resnik were not aware that Silva engaged in criminal activity, let alone as part of a family criminal enterprise with interconnected schemes to obtain illicit profits.  Cross-[c]omplainants' lack of knowledge as to the existence and nature of the Silva/Aviles Family RICO Enterprise at the time was largely due to the outright lies and shades of deception that Silva had shared with

32

Resnik, and that [Mary] Aviles even continues to tell Resnik and ROAR to date." (Fn. omitted.)

Paragraph 63 at page 21, footnote 5: "Through late 2021, [Mary] Aviles still insists via e-mail to Resnik that Silva has nothing to do with the underlying HFS partnership dispute. See Exhibit H." (Bold omitted.)

Paragraph 64 at page 21, lines 14 to 19: "It now appears that Silva kept his name dissociated from HFS (and used [Mary] Aviles' name) since 2010 to keep both his Healthpointe (i.e., the Healthpointe [a]djacent [l]ien [p]urchases) and Starbase/AFIS dealings with HFS hidden from investigators and prosecutors who were already clued into Silva's criminal schemes, and to insulate the Silva/Aviles Family RICO Enterprise from detection by law enforcement and others who had business and close personal dealings with [c]ross-[d]efendants." (Italics omitted.)

Entirety of paragraph 71(c) at page 25: "[HFS]: On information and belief, Silva formed HFS to secretly benefit himself and the Silva/Aviles Family RICO Enterprise. Silva made his sister, [Mary] Aviles, the owner via her interest in HMA to fraudulently conceal his ownership and control of HFS. The Silva/Aviles Family RICO Enterprise used HFS to: (a) launder or 'clean' the proceeds of criminal activity from the other Silva/Aviles Family RICO Enterprise [e]ntities; (b) profit from fraudulently procured financing for and interest from HFS; and (c) conceal and profit from kickbacks and health care fraud associated with Healthpointe and Orangewood."

Entirety of paragraph 71(f) at page 26: "[NIOM]: On information and belief, NIOM is a company owned by [Mary] Aviles on paper and managed by Geli as president and secretary. The Silva/Aviles Family RICO Enterprise caused Healthpointe

physicians to bill patients for NIOM services, without telling patients, so that NIOM would hold a lien on those patients' personal injury settlements and ultimately collect from the amounts owed to those patients."

Paragraph 75 at pages 28, lines 1 to 11: "Furthermore, Silva also facilitated the scheme by emailing voice dictation files (a) to [Mary] Aviles, who then transcribed the audio into emails that she sent to Resnik, and (b) to Geli, who then transcribed the audio into emails that he sent from [Mary] Aviles' email address to Resnik. Silva also included James [Aviles] and Medina on these email threads and on information and belief, employed the same method of communication to instruct their conduct. On information and belief, all or nearly all of these emails were transmitted using interstate wire communications. On information and belief, there are hundreds of these emails where Silva dictates voice file messages for [Mary] Aviles and Geli and other coconspirators to transcribe—essentially verbatim—to Resnik and others. Silva's hiding behind these voice files was all to avoid the appearance of the obvious truth that Silva controls the Silva/Aviles Family RICO Enterprise [e]ntities and is the head of the Silva/Aviles Family RICO Enterprise."

Paragraph 75(a) at page 28, lines 15 to 27: "The following is an email that [Mary] Aviles purportedly wrote to Resnik, but in reality, the email is a verbatim transcription of Silva's voice message to [Mary] Aviles. In a voice message Silva emailed to [Mary] Aviles, he states: [¶] "Enough of this [indecipherable] bullshit okay . . . don't send this out tonight we can uh push it for the weekend okay . . . and say . . . I will be discussing this further with my attorneys . . . period . . . I do not authorize any HFS payments in this regard . . . period . . . I will let the attorney

34

follow up on this . . . I will let my attorney follow up on this.  [¶]
. . . Then, [Mary] Aviles sent the following email at 11:57 p.m. on
Sunday:  [Image of email in which Mary Aviles states, 'I will be
discussing this further with my attorneys.  I do not authorize any
HFS payments in this regard.  I will let my attorney follow up on
this.'].”[7]

Paragraph 75(b)-(d) at page 29, line 1 to page 33, line 19,
which describes voicemails Silva left for Mary Aviles and Geli
directing them to send certain business emails and images of the
emails sent thereafter.

Entirety of paragraph 76 at page 33, which describes
communications between Tanya Moreland King and Silva that
Silva had exclusive control over where Healthpointe doctors
would provide services.

Paragraph 78 at page 34, lines 13 to 14, 16:  “Cross-
[d]efendants [Mary] Aviles, James [Aviles], and Geli conducted
and/or participated in the conduct of the affairs of the
Silva/Aviles Family RICO Enterprise by following Silva’s
directions” and “kickbacks and rebates, furthering the
misrepresentations, material omissions, and conflicts of.”

Paragraph 118 at page 49, lines 1 to 2:  “[T]he implication
of HFS in [c]ross-[d]efendants’ criminal enterprise.”

Paragraph 118 at page 49, lines 5 and 6 to 9:  “Had Silva
not misrepresented facts regarding,” and “Silva’s effective control
of numerous conflicted business entities, ROAR and Resnik
would never have initially agreed to form HFS with HMA and

---

[7] Although this statement mentions attorneys, it is not a
litigation-related communication.  Rather, it discusses whether
HFS should make certain payments.

35

[Mary] Aviles, or do business with Orangewood, Starbase, AFIS, or other Silva/Aviles Family RICO Enterprise [e]ntities."

Paragraph 119 at page 49, lines 18 to 22: "Had [c]ross-[c]omplainants learned the truth underlying [c]ross-[d]efendants' above-described misrepresentations and material omissions, including Silva's effective control of numerous conflicted business entities, ROAR and Resnik would never have initially agreed to form HFS with HMA and [Mary] Aviles, or do business with Orangewood, Starbase, AFIS, or other Silva/Aviles Family RICO Enterprise [e]ntities."

Paragraph 120 at page 50, lines 6, 7 to 10; paragraph 126 at page 52, lines 14, 15 to 18; paragraph 128 at page 53, lines 15, 16 to 19: "Had Silva not misrepresented facts regarding," and "Silva's effective control of numerous conflicted business entities, [c]ross-[c]omplainants would never have initially agreed to form HFS with HMA and [Mary] Aviles, or do business with Orangewood, Starbase, AFIS, or other Silva/Aviles Family RICO Enterprise [e]ntities."

Paragraph 126 at page 52, lines 10 to 12: "[T]he implication of HFS in [c]ross-[d]efendants' criminal enterprise has and will cause irreparable harm to [c]ross-[c]omplainants' reputation amongst medical-legal practitioners in the California workers."

Paragraph 138 at page 56, lines 11 to 16: "The implication of HFS in [c]ross-[d]efendants' criminal conduct, which was only possible through [c]ross-[d]efendants' fraud on [c]ross-[c]omplainants, has caused and will continue to cause irreparable harm to [c]ross-[c]omplainants' reputation amongst medical-legal practitioners in the California workers' compensation industry

36

and plaintiffs' attorneys who facilitate medical treatment on a lien basis."

Paragraph 138 at page 56, lines 16, 17 to 20: "Had [c]ross-[d]efendants not misrepresented facts regarding," and "Silva's effective control of numerous conflicted business entities, ROAR and Resnik would never have initially agreed to form HFS with HMA and [Mary] Aviles, or do business with Orangewood, Starbase, AFIS, or other Silva/Aviles Family RICO Enterprise [e]ntities."

## C. Prong Two: The Resnick Parties Concede They Cannot Show Minimal Merit as to the Litigation-Related Statements in Category One

Cross-defendants argue at length that the Resnick parties cannot establish that the claims at issue in the FAXC have minimal merit. The Resnick parties offer no cogent argument in response demonstrating any of their claims (whether in category one or any other category) has minimal merit. Rather, they contend, "Cross-[c]omplainants have no interest in defending the 'merit' of any hypothetical claims that [c]ross-[d]efendants imagine the FAXC seeks to establish based on that speech." The Resnick parties thus concede the allegations based on litigation-related statements in category one lack minimal merit and should be stricken. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)[8]

The Resnick parties further note that an anti-SLAPP motion cannot be used to strike allegations that do not concern protected activity, and therefore "the most that [c]ross-

---

[8] Given this concession, the HMA defendants' appeal of the trial court's evidentiary ruling is moot.

37

[d]efendants can seek is to strike the litigation-related statements." (Bold omitted.) We agree, and the particular claims we order stricken do not result in any of the FAXC's causes of action being stricken in its entirety.

## DISPOSITION

As to the allegations listed below, the trial court's order denying cross-defendants' motion to strike pursuant to section 425.16 is reversed.

Paragraph 7 at page 6, lines 11 to 13: "Following this Felony Complaint filing, as detailed below, Silva assuaged and 'lulled' ROAR and Resnik to avoid detection of the fraud being perpetrated under their noses." (Fn. omitted.)

Paragraph 42 at page 14, lines 21 to 22: "Silva reassured Resnik that there was no problem with continuing to accept business generated from Healthpointe physicians and patients . . . ."

Entirety of paragraph 45 at page 15: "In response, Silva emailed Resnik several voice messages reassuring Resnik that the allegations were not true. [Image.] The attached voice message from Silva reads: [¶] 'So yeah I just looked at the WorkCompCentral article . . . um as I mentioned I had already seen this . . . lookin' at it, there wasn't anything specific that says that the amount of money that they have to prove up . . . because there wasn't any of that happening . . . obviously there's a lot of allegations all against me and they're not true. . . .' "

Entirety of paragraph 46 at pages 15 to 16: "Silva emailed another voice message to Resnik later that morning representing that the only problem posed by the civil RICO lawsuit was that it would create bad publicity. [Image.] The attached voice message from Silva reads: [¶] 'this thing will get long and drawn out and

38

expensive and um the thing is though, take a look at the comment at the right of the patient, probably made by an ortho surgeon or a doctor or a plant by the newspaper itself . . . yeah we're going to be okay in all this, no question about it, it's just the publicity behind it that's the problem . . . we've got all this BS going on . . . in the long run there is no question in my mind we'll be fine . . . you're innocent until proven guilty . . . they're going to have a hard pressed time with a number of the guys here . . . none of these issues . . . I'm not concerned . . . the problem is that we're going to have to defend all this . . . .' "

Entirety of paragraph 47 at page 16: "Because dozens of physicians and health care adjacent entities were discussed in the lawsuit, Resnik accepted Silva's representations at the time, believing that a plaintiff's attorney might have been aggressive in naming defendants."

Paragraph 51 at page 17, line 21 to page 18, line 8: "Silva responded to the news by marking up a contemporaneous status update with a stylus and tablet, informing Resnik that there was no concern because Starbase and AFIS would cooperate to protect HFS, neither was a named defendant, and Silva's name was not associated with Starbase, rather Geli's name was the one on paper: [image of marked up status report]."

Paragraph 63 at page 21, lines 4 to 11: "After all, the lawsuits against Healthpointe and Starbase had been civil in nature, and Silva repeatedly provided reassurances to Resnik that superficially appeared to prove true. For example, when Silva reassured Resnik that there was no cause for concern about the 2012 Qui Tam lawsuit, the lawsuit resolved without any harm to HFS. And when Silva reassured Resnik that there was no cause for concern about the 2015 civil RICO lawsuit, the

lawsuit was dismissed without any harm to HFS. So, when the 2017 Felony Complaint was filed by the Orange County District Attorney's office, and Silva said it would only implicate Geli and that there was no cause for concern, ROAR and Resnik continued to believe Silva."

Paragraph 67(c) at page 23, lines 15 to 17: "At the time, Silva reassured Resnik that many defendants had been wrapped up in the SCIF case, and it would simply be a publicity problem."

Paragraph 118 at page 48, line 27 to page 49, line 2; and paragraph 126 at page 52, lines 9 to 10: "Cross-Defendants' misrepresentations to Cross-Complainants of facts relating to civil lawsuits against Silva, Healthpointe, and Starbase . . . ."

Paragraph 118 at page 49, lines 5 to 6; paragraph 126 at page 52, lines 14 to 15; paragraph 128 at page 53, lines 15 to 16; and paragraph 138 at page 56, lines 16 to 17: "civil complaints against him and his entities, the criminal complaint against Silva and Geli . . . ."

Paragraph 118 at page 49, lines 9 to 12; paragraph 119 at page 49, lines 22 to 25; paragraph 120 at page 50, lines 10 to 13; paragraph 126 at page 52, lines 18 to 21; paragraph 128 at page 53, lines 19 to 22; paragraph 138 at page 56, lines 20 to 23; and paragraph 139 at page 57, lines 5 to 8: "Had Cross-Defendants not continuously misrepresented the nature of civil lawsuits being brought against Silva and Starbase and Healthpointe, or of criminal lawsuits brought against Silva and Geli, ROAR and Resnik would have dissolved the HFS partnership much earlier."

Paragraph 120 at page 50, lines 6 to 7: "civil complaints against him and various Cross-Defendant Entities, the criminal complaint against Silva and Geli . . . ."

Paragraph 127 at page 53, lines 4 to 7: "Had Silva not continuously misrepresented the nature of civil lawsuits being brought against Silva and Starbase and Healthpointe, or of criminal lawsuits brought against Silva and Geli, Cross-Complainants would have dissolved the HFS partnership much earlier."

Paragraph 138 at page 56, lines 9 to 11: "Cross-Complainants are entitled to recover damages arising from reputational harm that Cross-Complainants suffered as a direct and proximate cause of Cross-Defendants' misrepresentations to Cross-Complainants of facts relating to his criminal indictment."

On remand, the trial court is directed to vacate its order denying the motion to strike and to enter a new order granting the motion in part and striking references to the above identified portions of the FAXC. As to the remainder of the challenged allegations, we affirm the trial court's order denying cross-defendants' motion to strike.

Each party is to bear its own costs on appeal.

NOT TO BE PUBLISHED


                                        WEINGART, J.


We concur:



ROTHSCHILD, P. J.



KELLEY, J.*

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.